UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| GERALD ANDERSON;<br><br>               Plaintiff,<br><br>    vs.<br><br>NORTHLAND RESTAURANT GROUP<br>LLC, D/B/A HARDEE'S,<br><br>             Defendant. | 5:14-CV-5005-JLV<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), *et seq.*, and the South Dakota Human Relations Act, SDCL § 20-13-1, *et seq.*, to recover damages arising from the termination of Gerald Anderson. Defendant Northland Restaurant Group LLC, d/b/a Hardee's has moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 on all of Plaintiff Anderson's claims. Plaintiff resists the motion.

**MATERIAL FACTS**

The facts, viewed in the light most favorable to Mr. Anderson, the nonmoving party are as follows:

Northland Restaurant Group, LLC d/b/a Hardee's ("NRG") hired Mr. Anderson as a crew member in August of 2012. Assistant Manager Danielle Dahlenburg ("Dahlenburg") interviewed Mr. Anderson. During the interview, Mr. Anderson was lead to believe that if he performed sexual favors for

1

Dahlenburg, he would be able to keep his job and possibly move up the ladder. (Docket 42-2 at p. 2).  Dahlenburg noted that due to Mr. Anderson's residence being in close proximity to the place of employment, she would stop by his residence later to give him some papers to review.  (Docket 42-2 at p. 4). Following the interview, Dahlenburg hired Mr. Anderson.  While Dahlenburg sometimes made initial decisions to hire and occasionally inform employees that they were being fired, Dahlenburg's conduct was subject to the General Manager, Jennifer Christensen's approval.  (Docket 33-2 at pp. 6-7; Docket 33-3 at p. 3).[1]

On that same day as Mr. Anderson's interview, Dahlenburg went through the orientation process with him.  (Docket 40 at ¶ 5).  Dahlenburg provided Mr. Anderson with various NRG's policies, including policies on sexual harassment and fraternization between supervisors and employees.  (Docket 40 at ¶ 6).  Mr. Anderson was also given a copy of NRG's orientation manual, rules, policies, and NRG's anti-harassment and discrimination policies.  (Docket 40 at ¶ 7). NRG's reporting procedures were posted in the employee breakroom.  (Docket 40 at ¶ 7).

Either on the evening of the interview or the following evening, Dahlenburg went to Mr. Anderson's home.  Mr. Anderson and Dahlenburg began a sexual relationship that evening.  (Docket 40 at ¶ 9).  Their sexual

---

[1] While Anderson objects to this fact and offers a theory as to why this isn't true, there is no factual basis contained within the record to refute this testimony.

relationship continued until the middle of September or early October[2] wherein they would engage in sexual relations at Mr. Anderson's apartment approximately three times a week.  (Docket 33-1 at p. 20).  Mr. Anderson made a sex video with Dahlenburg.  (Docket 33-1 at p. 22).  Mr. Anderson and Dahlenburg text messaged each other several times a day during the eight week period of their relationship.  (Docket 33-1 at p. 20).  Some of these text message sent by Mr. Anderson to Dahlenburg were sexual in nature.  Id.  Mr. Anderson took photographs of Dahlenburg while at work.  (Docket 33-1 at p. 23).  Mr. Anderson would also follow Dahlenburg around at work.  (Docket 33-1 at p. 25).

A co-worker told General Manager Christensen, that Dahlenburg and Mr. Anderson had "a relationship outside of work."  (Docket 33-3 at p. 3). Christensen talked to Dahlenburg and Mr. Anderson separately asking them if they had a relationship outside of work.  Id.  Both denied the relationship. (Docket 40 at ¶11).  Christensen went over the fraternization policy with both Dahlenburg and Mr. Anderson; thereafter, no additional actions were taken by Christensen regarding the relationship between Dahlenburg and Mr. Anderson. (Docket 33-3 at p. 3).

At no time did Mr. Anderson report to Christensen that Dahlenburg told him that he would be rewarded with promotions if he were to engage in a

---

[2] In his deposition, Mr. Anderson thought that he ended the relationship around the middle of September, because it was close to his cousin's September 11th birthday.  (Docket 42-2 at p. 13).  However, in his affidavit, Mr. Anderson states that he was mistaken during his deposition and states that he ended the relationship in early October, as he now remembers that he ended the relationship approximately one week before he was terminated from his employment. (Docket 41 at ¶9).

relationship with her.  (Docket 40 at ¶13).  From the time Mr. Anderson was hired until the end of the sexual relationship, Mr. Anderson did not tell Dahlenburg that he did not want to be involved in a sexual relationship with her.  (Docket 40 at ¶15).

In middle September or early October, Mr. Anderson ended the relationship with Dahlenburg.  Mr. Anderson's employment was terminated by Christensen on October 12, 2012.

At no time during his employment did Mr. Anderson report the existence of his relationship with Dahlenburg to Christensen or any NRG official. (Docket 40 at ¶31).  After Mr. Anderson's termination, he had further contact with Dahlenburg including taking a Christmas picture together, which Anderson sent to his mother.  (Docket 33-1 at p. 22).  Mr. Anderson filed a Charge of Discrimination on April 4, 2013, revealing Dahlenburg's violation of the fraternization policy and thereafter, Dahlenburg was fired.

## STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp.,

600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie

if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

        The burden is placed on the moving party to establish both the absence

of any genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met

its burden, the nonmoving party may not simply rest on the allegations in the

pleadings, but must set forth specific facts, by affidavit or other evidence,

showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at

256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions

of fact and properly address the opposing party's assertions of fact, as required

by Rule 56(c)).

        The underlying substantive law identifies which facts are "material" for

purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.

"Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment.  Factual

disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A

CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE

AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact."  Id. at 247–48.

5

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  "There is no 'discrimination case excerption' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1018 (8th Cir. 2011)(citing Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011)).

## DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against employees with respect to their compensation, terms, conditions, or privileges of employment, because of race, color, religion, sex or national origin.  *See* 42 U.S.C. §2000e-2(a)(1).  Plaintiff claims he was subjected to sexual harassment in violation of Title VII.  Title VII prohibits both quid pro quo harassment and hostile work environment harassment.  Plaintiff's verified complaint states a claim for only quid pro quo harassment, not a hostile work environment claim.

## I.     Quid Pro Quo Sexual Harassment

"Sexual harassment that results in a tangible employment action is considered quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands." Moberly v. Midcontinent

Communications, 711 F.Supp.2d 1028, 1038 (D.S.D. 2010)(quoting Henthorn v. Capitol Commc'ns, Inc. 359 F.3d 1021 (8th Cir. 2004)).  "A plaintiff in that situation need not prove that the offensive conduct is severe or pervasive because any carried-out threat is itself deemed an actionable change in the terms or conditions of employment."  Id.

> **A.   Whether Mr. Anderson's claim is to be analyzed under the McDonnel Douglas burden shifting framework or the Desert Palace motivating factor analysis.**

Discrimination and sexual harassments claims have historically been analyzed under the familiar McDonnel Douglas burden-shifting framework.  Under McDonnel Douglas, an employee must establish a prima facia claim for harassment.  If the employee meets it burden, then burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action.  If the employer meets this burden, then the burden shifts back to the employee to show that the employer's reason is really a pretext for the discrimination.

Plaintiff urges the court to disregard the McDonnel Douglas analysis and proposes that Mr. Anderson's claim should be considered under the "motivating factor" analysis of Desert Palace v. Costa, 539 U.S. 90 (2003).  The Eighth Circuit Court of Appeals has considered and rejected this same argument in Griffith v. City of Des Moines, 387 F.3d 733 (8th Cir. 2004).  The Eighth Circuit held:

> Griffith urges us to conclude, as some district courts have concluded, that the Supreme Court in Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), implicitly directed us to modify our Circuit's use of the familiar framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), at the summary

7

judgment stage of an employment discrimination lawsuit. . . We do not agree that Desert Palace affected controlling Eighth Circuit precedents in this fashion. Desert Palace involved the post-trial issue of when the trial court should give a "mixed motive" jury instruction under 1991 Title VII amendments codified at 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g)(2)(B). The Court's opinion did not even cite McDonnell Douglas, much less discuss how those statutes impact our prior summary judgment decisions. While in general the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, Reeves v. Sanderson Plumbing Products, Inc. 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the contexts of the two inquiries are significantly different. At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant to summary judgment. Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues. Thus, Desert Palace, a decision in which the Supreme Court decided only a mixed motive jury instruction issue, is an inherently unreliable basis for district courts to begin ignoring this Circuit's controlling summary judgment precedents.

Griffith, 387 F.3d at 735 (8th Cir. 2004). Consistent with the holding of

Griffith, this court also concludes that Desert Palace does not eliminate or

modify the McDonnel Douglas burden shifting framework to be applied at the

summary judgment stage.

Accordingly, under the McDonnel Douglas burden shifting analysis, to

demonstrate a prima facia case of quid pro quo sexual harassment, Mr.

Anderson must show:

> (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) his submission to the unwelcome advances was an express or implied condition for receiving job benefits or his refusal to submit resulted in a tangible job detriment.

Ogden v. Wax Works, Inc., 214 F.3d 999, 1006 n. 8 (8th Cir. 2000).   If Mr.
Anderson establishes a prima facia case, the burden shifts to the employer to
articulate a legitimate, nondiscriminatory reason for its action.  If the employer
meets its burden, then the burden shifts back to Mr. Anderson to show that
the employer's reason is really a pretext for discrimination.

### B.    Prima Facia case

#### 1.    Member of a protected class

NRG has conceded that for purposes of its motion for summary
judgment, Mr. Anderson is a member of a protected class.  [Doc. 31, p. 10, n.
5].

#### 2.    Subjected to unwelcome harassment

With respect to the second element of a prima facia case, whether Mr.
Anderson was subject to unwelcome harassment in the form of sexual
advances or requests for sexual favors, "[t]he conduct at issue must be
'unwelcome' in that the plaintiff neither solicited it nor invited it and regarded
the conduct as undesirable or offensive."  Scusa v. Nestle U.S.A. Co., 181 F.3d
958, 966 (8th Cir. 1999).

NRG argues that Dahlenburg's conduct was not unwelcome because Mr.
Anderson did not tell Dahlenburg that he didn't want to be in a relationship
with her, that he was a willing participant in the relationship as evidence by
inviting Dahlenburg to his residence, following her around at work and
maintaining contact with her after he ended the sexual relationship.
Furthermore, NRG argues that Mr. Anderson's failure to report the promotion

promises made by Dahlenburg to either General Manager Christensen or anyone at NRG establishes that Mr. Anderson was not subjected to unwelcome harassment.

Mr. Anderson asserts that the relationship with Dahlenburg was unwelcome.  In support thereof, Mr. Anderson submitted an affidavit stating that Dahlenburg told him that he "would be able to keep [his] job and possibly move up the ladder if [he] participated in a sexual relationship with her" which was "precisely why [he] participated in the relationship with her."  (Docket 41 at ¶3).  Mr. Anderson also states in his affidavit that Dahlenburg's advances were unwelcome, humiliating and embarrassing.  (Docket 41 at ¶4).

There is no dispute that Mr. Anderson was a consensual participant in the sexual relationship.  In his deposition, Mr. Anderson testified as follows:

> Q:   Did you consent to be involved in the sexual
>       relationship with Danielle?
>
> A:   Did I consent to it?
>
> Q:   Yeah.  Were you a willing participant?
>
> A:   At the time, yeah.

(Docket 33-1 at p. 24).  However, Mr. Anderson's voluntary participation in the relationship is not determinative of whether the alleged harassment was unwelcome.  "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against [his] will, is not a defense to a sexual harassment suit brought under Title VII."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986).  Instead, "the correct inquiry is

whether [plaintiff] by [his] conduct indicated that the alleged sexual advances were unwelcome, not whether [his] actual participation in sexual intercourse was voluntary."  Id. at 68.

In his affidavit, Mr. Anderson states that Ms. Dahlenburg's advances were not welcome.  The Anderson affidavit continues, "As I said in my deposition, I found it humiliating and embarrassing that she used her power to "lead" me into the relationship."  (Docket 41 at ¶4).

NRG asserts that Anderson's affidavit directly contradicts his prior deposition testimony, contains allegations that are largely based on speculation or conjecture rather than personal knowledge, contains hearsay, or alleges facts not material to the issues at hand, and therefore, should not form the basis of the denial of summary judgment.

In City of St. Joseph, Missouri, v. Southwestern Bell Telephone, 439 F.3d 468 (8th Cir. 2006), the Eighth Circuit addressed "'the troublesome issue of whether summary judgment may be granted when one of the parties after giving a deposition later files an affidavit with directly contrary statements.'"  City of St. Joseph, 439 F.3d at 475 (quoting Camfield Tires, Inc. Michelin Tire Corp., 719 F.2d 1361, 1363 (8th Cir. 1983)).  The Court noted that a party who had been examined at length in a deposition could not raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony.  City of St. Joseph, 439 F.3d at 476.  However, courts are to use extreme care in examining such issues and may rely on the affidavit when the affiant states in his affidavit that he was confused in his deposition, or where the affiant needs

11

to explain portions of his deposition testimony that were unclear, and where the affidavit does not actually contradict his earlier testimony.

While the court may rely on affidavits which seek to clarify confusion during the deposition or a mistake, it may reject an affidavit as a sham if it fails to explain aspects of the deposition testimony or resolve an internal consistency within the deposition. Camfield Tires, Inc v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir. 1983). Of significance to the court in Camfield Tires, was the timing of the affidavit which was filed by the plaintiff for the express purpose of opposing summary judgment, a year after he gave his deposition testimony. Similarly, Mr. Anderson gave his deposition testimony on May 13, 2014. During the next seven months, Mr. Anderson did not seek to correct the testimony, until immediately before filing his opposition to the summary judgment.

Mr. Anderson was quite clear, direct, and recalled with specificity his involvement in the relationship. There is no degree of confusion on the part of the plaintiff or the attorney. Camfield Tires, 719 F.2d 1361, 1364 (quoting Kennett-Murray Corp. v. Boone, 662 F2d. 887, 893(5th Cir. 1980)(allowing an affidavit where there are frequent shifts in the questioning. . . with a degree of confusion on the party of the deponent and the attorney)).

Although Mr. Anderson now claims in his affidavit that Dahlenburg's advances were not welcome, he previously testified to the contrary. Following the testimony wherein Mr. Anderson stated that he was a voluntary participant in the relationship, he then testified as follows:

12

> Q:     Did you enjoy the relationship you had with her
>
>        until you broke it off?
>
> A:     At the time? It was okay.

(Docket 33-1 at p. 24).  The assertion in Mr. Anderson's affidavit that the
advances were unwelcome is in direct contradiction to his deposition testimony
wherein he was specifically asked, "Did you enjoy the relationship you had with
her until you broke it off?"  To which Mr. Anderson said, "At the time? It was
okay."  Id.  Webster's Dictionary defines "okay" as, "all right, approval,
endorsement, sanction, or authorization."  Webster's Third New International
Dictionary 1569 (3rd ed. 1981).

    The Anderson affidavit continues, "As I said in my deposition, I found it
humiliating and embarrassing that she used her power to "lead" me into the
relationship."  (Docket 41 at ¶ 4).  Although Mr. Anderson cites his deposition
testimony which uses the words "humiliating" and "embarrassing," the affidavit
is a mischaracterization of his actual deposition testimony.  The exact
exchange is as follows:

> Q:     In terms of emotional distress type damages, tell
>
>        me what type of injuries beyond wages that you
>
>        claim you're owed as a result of the alleged
>
>        discrimination and harassment.
>
> A:     As far as humiliation and embarrassment?
>
> Q:     Yeah.

A:       I believe it's embarrassing and humiliating that I was

led around by my penis so easily.

(Docket 42-2 at p.16).  This testimony does not raise a question of fact as to whether the relationship was unwelcome at the time he was engaged in it.  On the contrary, a fair reading of Mr. Anderson's testimony establishes that his sexual desires led him into the relationship with Dahlenburg.  He doesn't testify that he was lead into a relationship by Dahlenburg; instead, he testified that he was led by his penis.  Id.  While Mr. Anderson may now feel embarrassed or humiliated about being involved in a relationship with Dahlenburg, his prior deposition testimony undermines the contrary statement asserted in an 11th hour affidavit that the sexual activity was unwelcome, embarrassing, or humiliating.

Like Camfield Tires, "the circumstances in this case do not suggest legitimate reasons for [the plaintiff's] filing of the inconsistent affidavit.  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  Id. at 1365.  Here, like the plaintiff in Camfield Tires, Mr. Anderson submits an affidavit flatly stating a different position, without explaining how he was either confused or mistaken.

Mr. Anderson must demonstrate that the "conduct at issue must be 'unwelcome' in that [he] neither solicited it nor invited it **and** regarded the conduct as undesirable or offensive."  Moberly v. Midcontinent Communication,

14

711 F.Supp.2d 1028, 1038 (D.S.D. 2010)(quoting <u>Scusa v. Nesltle U.S.A. Co.</u>,
181 F.3d 958, 966 (8th Cir. 1999)).  In addition to Mr. Anderson's testimony
that he found the sexual relationship "okay," the record establishes that the
conduct was not unwelcome.  Mr. Anderson and Dahlenburg engaged in sexual
relations three times a week at his apartment.  (Docket 33-1 at p. 20).  Mr.
Anderson made a sex video with Dahlenburg.  (Docket 33-1 at p. 22).  Mr.
Anderson and Dahlenburg text messaged each other several times a day during
the eight week period of their relationship.  (Docket 33-1 at p. 20).  Some of
these text message sent by Mr. Anderson to Dahlenburg were sexual in nature.
<u>Id.</u>  Mr. Anderson took photographs of Dahlenburg while at work.  (Docket 33-1
at p. 23).  In fact, Mr. Anderson admitted that, "it got to the point at the store
that I was following Danielle around so much that [the General Manager]
literally pulled me to the side and said, huh-uh, no more."  (Docket 33-1 at p.
25).

   From the time he was hired until the end of the sexual relationship, Mr.
Anderson did not tell Dahlenburg that he did not want to be involved in a
sexual relationship with her.  (Docket 33-1 at p. 23).  Even after the
relationship ended but while Mr. Anderson was still employed, Mr. Anderson
and Dahlenburg continued to have text message or telephone conversations.
(Docket 33-1 at pp. 21-22).  In fact, after Mr. Anderson was terminated, he took
a Christmas photo with Dahlenburg, which Mr. Anderson sent to his mother.
(Docket 33-1 at p. 22).  This conduct files in the face of Mr. Anderson's affidavit
that attempts to create a question of act by now asserting that the advances

were not welcome.  When applying the proper inquiry of whether the plaintiff indicated by his conduct that the harassment was unwelcome, <u>Williams v. Herron</u>, 687 F.3d 971, 975 (8th Cir. 2012), the court concludes that the sexual advances were not unwelcome.

Thus, Mr. Anderson's claim that the sexual harassment from Dahlenburg was unwelcome fails a matter of law as he cannot establish the first element of a prima facie case for quid pro quo sexual harassment.

Moreover, even if there is an issue of fact regarding whether the sexual conduct was unwelcome, there is no issue of material fact regarding the fourth element of the prima facia case.

### 3.    Lack of nexus between end of relationship and employment termination

Anderson terminated the relationship not only because he realized that Dahlenburg was not going to follow through in her promise to help him move up the latter, but also because he began a relationship with another woman and did not want to be involved with Dahlenburg on the side.  (Docket 41 at ¶9).  Mr. Anderson described the conversation where he terminated their relationship as follows, "In all honesty, I said, look, this is not going the way you said it was going.  And as a matter of fact, I found somebody else.  And that was basically it." (Docket 33-1 at p. 20).  There is no evidence that once Mr. Anderson terminated the relationship with Dahlenburg, that he was subjected to unwelcome harassment or that Mr. Anderson's employment was conditioned upon him engaging in a sexual relationship with Dahlenburg.  In fact, at the time Mr. Anderson terminated the relationship with Dahlenburg, he

16

was aware that his ability to "move up the chain" was not conditioned upon his relationship with Dahlenburg.  (Docket 33-1 at p. 21).

Mr. Anderson fails to cite any evidence contained in the record that his discontinuation of the relationship resulted in his employment termination. On the contrary, the undisputed record establishes that only Christensen had the power to fire Mr. Anderson.  (Docket 33-3 at pp. 5, 7; Docket 33-2 at p. 6). Mr. Anderson refutes this by submitting a job description for the assistant manager.  (Docket 42-10).  Nothing contained within Exhibit 10 specifically states that the assistant manager has the authority to fire an employee. Christensen terminated Mr. Anderson.  There is no evidence in the record to raise a question of fact that the termination was due to an ended relationship between Mr. Anderson with Dahlenburg; a relationship which they both denied to Christensen.

Mr. Anderson also offers a theory that Dahlenburg and Christensen were good friends resulting in Mr. Anderson's termination.  This falls short of Mr. Anderson's burden to resist a motion for summary judgment which requires him to substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy."  Gregory v. Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1986).  Mr. Anderson has failed to present any evidence raising a question of fact that ending his relationship with the assistant manager resulted in his termination by the manager.

Therefore, Mr. Anderson has failed to establish two of the four necessary elements in order to make prima facia case of quid pro quo sexual harassment.

## CONCLUSION

Based on the foregoing discussion, this Court respectfully recommends that summary judgment be granted in favor of the Defendant.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 18th day of January, 2016.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

18